UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JONATHAN MATTIX, individually and as independent administrator of, and on behalf of the ESTATE OF GEORGIA KAY BALDWIN, and GEORGIA KAY BALDWIN's heir(s)-at-law; JOSHUA MATTIX, individually; and JUSTIN BALDWIN, individually, | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | CIVIL ACTION NO. 4:23-CV-635-Y |
| Plaintiffs, | §<br>§ | JURY DEMANDED |
| | § | |
| v. | §<br>§ | |
| TARRANT COUNTY, TEXAS, | §<br>§ | |
| Defendant. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

> **This is a case of a tragic pretrial detainee death resulting from violation of constitutional rights. Tarrant County's policies, practices, and customs caused Georgia Kay Baldwin's suffering and death.**

Table of Contents

I.    Introductory Allegations ........................................................................... 3
      A.    Parties ........................................................................................... 3
      B.    Jurisdiction and Venue ................................................................. 4
II.   Factual Allegations .................................................................................. 4
      A.    Preliminary Statements ................................................................ 4
      B.    Ms. Baldwin's Suffering and Death Resulting from Incarceration in the
            Tarrant County Jail ...................................................................... 6
            1.    Factual Summary ................................................................. 6
            2.    Medical Records / Death Reports ...................................... 13
                  a.    Autopsy Report ....................................................... 13
                  b.    Custodial Death Report (Filed with Attorney General) .......... 13
                  c.    Inmate Death Report (Filed with TCJS) ................. 14
            3.    Texas Rangers Investigation .............................................. 14
      C.    Tarrant County Liability Pursuant to *Monell* ............................. 16
            1.    Introduction ...................................................................... 16
            2.    Tarrant County Policies, Practices, and Customs .............. 18
            3.    TCJS Records Demonstrating County Practices and/or Customs ....... 21
            4.    Tarrant County Jail Suffering and Deaths Show a Custom and
                  Pattern of Indifference .................................................... 27
III.  Causes of Action ................................................................................... 44
      A.    Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983:
            Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .................. 44
      B.    Remedies for Violation of Constitutional Rights ........................... 46
      C.    Cause of Action Against Tarrant County Under 42 U.S.C. § 1983 for
            Violation of Constitutional Rights ................................................ 46
IV.   Concluding Allegations and Prayer ........................................................ 49
      A.    Conditions Precedent .................................................................. 49
      B.    Use of Documents at Trial or Pretrial Proceedings ...................... 49
      C.    Jury Demand ............................................................................... 49
      D.    Prayer ......................................................................................... 49

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this first amended complaint and for cause of action will show the following.

I.      Introductory Allegations

    A.      Parties

1.      Plaintiff Jonathan Mattix (sometimes referred to by first name only) is a natural person who resides and is domiciled in Texas. Jonathan Mattix is Georgia Kay Baldwin's legal and biological son. Georgia Kay Baldwin is referred to herein at times as the "decedent." Jonathan Mattix sues in his individual capacity and as the independent administrator of the Estate of Georgia Kay Baldwin, Deceased. Jonathan Mattix, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of himself and any other wrongful death beneficiaries (including Joshua Mattix and Justin Baldwin), and he seeks all wrongful death damages available to those people. Jonathan Mattix also sues in that capacity asserting claims on behalf of the estate and all of Ms. Baldwin's heirs (including himself, Joshua Mattix, and Justin Baldwin) (collectively, the "Claimant Heirs"). Jonathan Mattix asserts claims on behalf of and seeks all survival damages and wrongful death damages available to the Claimant Heirs, to the extent legally appropriate and available. Jonathan Mattix also sues in his individual capacity and seeks all wrongful death damages available to him. Letters of Independent Administration were issued to Jonathan Mattix on or about June 2023, in Cause Number PR-22-02267-2, in the Probate Court No. 2 of Dallas County, Texas, in a case styled *Estate of Georgia Baldwin, Deceased.* Joshua Mattix and Justin Baldwin also, as Plaintiffs in this case, sue in their individual capacities and seek all wrongful death damages available to them. Joshua Mattix and Justin Baldwin are Georgia Kay Baldwin's legal and biological sons.

2.     Defendant Tarrant County, Texas ("Tarrant County" or the "County") is a Texas county that was served with process and made an appearance in this case. The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions or failures to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). County policies, practices, and/or customs were moving forces behind, and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages and death referenced in this pleading.

B.     Jurisdiction and Venue

3.     The court has original subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County because it is a Texas county. Venue is proper in the Fort Worth Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in the County, which is in the Fort Worth Division of the United States District Court for the Northern District of Texas.

II.     Factual Allegations

A.     Preliminary Statements

4.     Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations. Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those

sections provide Defendant sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claims have facial plausibility. Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, if Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done their best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

5.      Plaintiffs plead facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. The County's policies, practices, and customs resulted in unconstitutional punishment and served no legitimate governmental interest. In the alternative, Plaintiffs plead facts which give rise to episodic acts or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional claims or guarantees but rather must merely plead facts that plausibly give rise to constitutional claims. Plaintiffs thus ask that the court apply the correct legal theory or theories to the facts pled.

6.      Further, in the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to, or personal knowledge of, specific details regarding the existence or absence of internal policies or training procedures before discovery. As such, a plaintiff need not specifically state what a municipal policy is and can rely on minimal factual allegations in the plaintiff's pleading. These minimal factual allegations may include but not be limited to multiple harms occurring to a plaintiff herself, misconduct that occurred in the open, involvement of multiple officials in misconduct, or merely the specific topic

of a challenged policy or training inadequacy. Even though this is Plaintiffs' first amended complaint, Plaintiffs may seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

B.   Ms. Baldwin's Suffering and Death Resulting from Incarceration in the Tarrant County Jail

1.   Factual Summary

7.   Ms. Baldwin, 52 years old, suffered a tragic completely unnecessary death on or about September 14, 2021, after being incarcerated in the Tarrant County jail. Tarrant County's policies, practices, and customs caused, were proximate causes of, and were moving forces behind Ms. Baldwin's suffering and death and all other damages referenced in this complaint. This section of the complaint provides only some material facts related to Ms. Baldwin's suffering and death. Plaintiffs set forth other material facts related to Ms. Baldwin's suffering and death in other portions of this complaint.

8.   Ms. Baldwin allegedly left voicemail messages for a law enforcement officer employed by the City of Arlington, Texas Police Department. The messages contained profanity and indications that Ms. Baldwin wanted one or more people to die. She also mentioned the "Governor of Mississippi" needing to "blow [someone] away." In one message, Ms. Baldwin allegedly said she was "just [calling to see if you are going to do your job for Amber Haggerman…]." In another message, Ms. Baldwin allegedly indicated that she was calling on the Labor Day holiday to see if someone was going to arrest Robert Shivers for Amber Haggerman so that Ms. Baldwin could receive $10,000.00 in her account. It was thus clear to everyone involved that Ms. Baldwin had significant mental health issues. When a detective with the Arlington Police Department researched Ms. Baldwin, the address listed on her driver's license was to a homeless

shelter. The detective also located four Lubbock Police Department reports from 2018 involving Ms. Baldwin. Those reports indicated in part that when police contacted Ms. Baldwin, she was apparently not mentally sound or coherent. Ms. Baldwin also indicated at that time that she was smoking crack with an FBI informant, and she also said "numerous things that did not make sense." Ms. Baldwin was transported to a hospital. One of her sons allegedly indicated that she had been acting paranoid for most of his life and that he thought she was having a mental health episode.

9.     Upon information and belief, the detective concluded based on this information that Ms. Baldwin had a mental health disorder. Regardless, she was arrested and charged with a crime as if she were a competent and coherent person. Ms. Baldwin was ultimately transported to the Tarrant County jail for incarceration.

10.     Ms. Baldwin went through booking and was incarcerated in the Lon Evans Corrections Center in Tarrant County at the time of her death. A Continuity of Care Query disclosed that Ms. Baldwin had apparently received inpatient mental health treatment before, through the North Texas Behavioral Health Authority.

11.     On May 13, 2021, a psychiatric examination of Ms. Baldwin was ordered and conducted by a Dr. Norman on Thursday, May 20, 2021. Ms. Baldwin was put under a "no bond" order pending that examination. Upon information and belief, the psychiatric report indicated that Ms. Baldwin was incompetent and thus unable to stand trial. That report was dated June 7, 2021. The incompetency determination was filed, and Ms. Baldwin was ordered to be incarcerated in a Tarrant County jail for a competency restoration program for no more than 60 days of a 120-day commitment. Upon information and belief, this determination occurred on or about June 18, 2021.

12.     During a July 20, 2021, competency evaluation, a Dr. Granado noted that Ms. Baldwin's health condition and "rational or factual understanding" had not improved. Dr. Granado

stated Ms. Baldwin was to be "closely monitored as to effects of her mental state to her functioning." Dr. Granado also recommended "that the court consider a review of the case for the possibility of state hospital commitment for further work on competency restoration in the hospital setting."

13.     On or about July 27, 2021, Ms. Baldwin was discharged from the competency restoration program. Her medical records note, "Her symptoms are likely to deteriorate if no intervention is initiated." Notes from a proceeding before a magistrate reflect that Ms. Baldwin was required to be transported to the North Texas State Hospital for the remainder of her 120-day commitment, but that did not occur. Tarrant County apparently instead chose to continue incarcerating Ms. Baldwin in a small cell, where she could not see through a window or view other human beings, until the time of her death. Texas Ranger Dendy learned after Ms. Baldwin's death that the area in which Ms. Baldwin was housed in the Lon Evans Corrections Center, located at 600 W. Weatherford Street in Fort Worth, Texas, was for "MHMR (Mental Health and Mental Retardation) inmates."

14.     Tarrant County knew from the time that it booked Ms. Baldwin that she had a severe mental illness. Tarrant County notified a magistrate on April 27, 2021, that Ms. Baldwin was "suspected of having mental illness or mental retardation." Numerous interactions through the incarceration concluding in Ms. Baldwin's death confirmed Tarrant County's knowledge, and further its failure and refusal to either transfer Ms. Baldwin to an appropriate outside mental health facility or have her medically evaluated and treated for the malady that resulted in her death.

15.     Despite Tarrant County's knowledge of Ms. Baldwin's mental health status, any mental health "treatment" she received was woefully inadequate. She had only five scheduled visits with MHMR during her five-month incarceration. The rest of her visits with a mental health

professional were unscheduled and very short (as short as two minutes and only as long as 32 minutes). More alarming, after Ms. Baldwin was supposed to be transported to North Texas State Hospital until the day she died, she only spent a total of 18 minutes with a mental health provider over the course of those seven weeks.

16.    The following table indicates some information learned by Tarrant County about Ms. Baldwin during her final incarceration.

| Date | Information Learned |
| --- | --- |
| April 27, 2021 | Ms. Baldwin reported history of anxiety years before and had no current thoughts of suicidal ideation. |
| May 17, 2021 | Ms. Baldwin was showing signs of agitation and speaking about things that make no sense. Ms. Baldwin's cellmate indicated that Ms. Baldwin had been up all night. Moreover, Ms. Baldwin was not doing well with personal hygiene. She was disheveled and had pressured speech with scattered thought. She had paranoia about the world and its finances. She was also fixating on finding "Jhonny" but would not provide details about Jhonny's identity. |
| May 25, 2021 | Ms. Baldwin would not take a bath or clean herself and emitted a bad body odor. Ms. Baldwin's cellmate was continuously complaining about Ms. Baldwin through a grievance procedure or to a supervisor, specifically that she would not shower or clean the cell. Ms. Baldwin was speaking loudly to a nonexistent person and hearing things that were not there. She would not take her medications, and Dr. Norman "had spoken with her and stated she is weird." Ms. Baldwin needed to be in a single cell, as she would stand over and stare at a cellmate. She was somewhat paranoid of notes being taken about her. |
| May 26, 2021 | Ms. Baldwin appeared to be delusional during screening for a competency restoration program. Her behavior was "strange/odd." |
| May 31, 2021 | Ms. Baldwin kept yelling about laundered money, babysitting everyone, and various presidents and their conspiracies. Ms. Baldwin seemed confused about her surroundings and had random outbursts in the housing unit, both inside and outside her cell. Ms. Baldwin was unkempt and had matted hair. She was in an irritable mood and displayed a delusional thought process, yelling when answering questions. For example, she yelled, "If the |

| | |
|---|---|
| | governor knew I was here he wouldn't like it. I'm sick of these people making up my mind." She also said, "I've been all around with a Nigerian. I need to find the tapes. I saved the world when I was in Los Angeles, me and a Nigerian. He is Nigerian." |
| June 2, 2021 | Ms. Baldwin said that a person stole her bubblegum and money. Ms. Baldwin was walking around and saying random things to other detainees. She was paranoid, exhibited a scattered thought process, and made poor eye contact. Ms. Baldwin had been refusing to take any mental health medications. |
| June 13, 2021 | Ms. Baldwin walked into the day room and made random and off-the-wall remarks to several people. She was rambling, yelling, cursing, and accusing everyone of strange things. She said that one person killed her son in Lebanon and then took over Russia. Ms. Baldwin was scaring some other detainees. She was put into her cell because of her strange behavior and based on a recommendation that she needed to talk to someone and be moved out of general population. |
| June 21, 2021 | Ms. Baldwin was continuously pushing the intercom button stating odd things, such as, "F**k you, you no good jerk. You are stalling gas lines right now." She would continually yell profanity toward officers and a trainee. She was agitated and did not appear to fully comprehend where she was. Ms. Baldwin did not have a cellmate at the time. She also called jailers and detainees terrorists. She was unkempt, had matted hair, and was uncooperative. She had a delusional thought process. Upon information and belief, Ms. Baldwin continued not to receive mental health treatment or medications. She said, "I don't need any mental health treatment, the governor will be mad, you guys are a bunch of wicked weirdos and you can't make me take my meds." Ms. Baldwin paced back and forth making statements about knowing President Obama. She said, "I've been around the world. I've taken the antidote. You guys are keeping my tapes from me." Ms. Baldwin was unable to communicate her needs, incapable of following directions, and was severely low functioning due to her mental health diagnosis. |
| June 22, 2021 | Ms. Baldwin would speak in a very "matter of fact" tone. She displayed erratic behavior in the jail pod, and she was adamant about not taking mental health medications. Moreover, she had no current medication orders. |
| June 24, 2021 | Ms. Baldwin said, "I do not need any help from anyone and I'm not going to take any medicine." When Ms. |

| | |
|---|---|
| | Baldwin was informed that she was in a court-ordered program, she refused services. |
| June 28, 2021 | Ms. Baldwin refused competency restoration services. |
| June 28, 2021 | Ms. Baldwin indicated that she was not in a program, and she moreover refused competency restoration services. |
| June 29, 2021 | Ms. Baldwin was "rude" and continued to refuse competency restoration services. Ms. Baldwin asked for cash and a bus ticket so that she could go to Arizona. |
| June 30, 2021 | Ms. Baldwin continued refusing competency restoration services and was "rude." |
| July 2, 2021 | Someone attempted to speak with Ms. Baldwin regarding the competency restoration program. Ms. Baldwin said, "I do not need a program." Ms. Baldwin displayed delusional behavior by stating, "I belong to the federal government and I'm not leaving this cell." She appeared to be responding to internal stimuli, and her behavior was strange/odd. |
| July 6, 2021 | Ms. Baldwin again refused competency restoration services. She also began to cry. She asked for a Greyhound bus ticket to Arizona. |
| July 7, 2021 | Ms. Baldwin continued to be delusional, and she continued asking for things that could not be obtained. She again asked for a bus ticket to Arizona as well as her money. A jailer reported that she was acting oddly or strangely. |
| July 8, 2021 | Ms. Baldwin refused competency restoration services, stating, "I do not need to be in any program. I need to go to Arizona and you need to get me a Greyhound bus ticket to get there." |
| July 13, 2021 | Ms. Baldwin consistently requested a bus ticket to Arizona and cash from her property and effectively refused competency restorations services. |
| July 14, 2021 | Ms. Baldwin refused competency restoration services. |
| July 16, 2021 | Ms. Baldwin again refused competency restoration services and would only speak about going to Arizona and why she wanted to leave Texas. All her discussion was illogical/irrational. |
| July 17, 2021 | Ms. Baldwin appeared disorganized with animated affect. She spoke about being tortured, stating that she is a "worldwide wanted hostage." She said that the government was out to kill her. |
| July 19, 2021 | Ms. Baldwin again requested a bus pass to Arizona and her property and apparently continued refusing competency restoration services. |

| July 21, 2021 | Ms. Baldwin apparently had not showered in five days. She asked again for a bus ticket. |
|---|---|
| July 23, 2021 | Ms. Baldwin presented elevated, with tense mood and delusional thought. She spoke about a therapist taking her hostage, death row, and being transported across the country illegally by a therapist. Ms. Baldwin still had no current medication orders. |
| July 30, 2021 | Ms. Baldwin presented as being agitated and with disorganized thoughts. She spoke about conspiracies, being taken hostage, and being extradited to a foreign country. Ms. Baldwin still had no current medication orders. |
| August 6, 2021 | Ms. Baldwin presented disorganized with flat affect and tense mood. She would jump from topic to topic, claiming to be an international hostage, and indicating that a therapist was part of a cover up conspiracy being conducted from Iraq. |
| August 11, 2021 | Ms. Baldwin presented with disorganized thoughts. She had clothing items on her head. She was seen talking to herself, and she began snapping and dancing. She spoke about being a hostage, the president coming to speak with her, and being an Iraqi refugee. |
| August 17, 2021 | Ms. Baldwin presented with a disheveled appearance. She talked about being held hostage and assassination attempts on her life. |
| August 27, 2021 | Ms. Baldwin once again presented disheveled with tense mood and affect and disorganized thoughts. She thought a therapist was "out to get her," indicating that a therapist was attempting to assassinate or kidnap her. Ms. Baldwin still had no current medication orders. |
| September 3, 2021 | Ms. Baldwin was agitated and disorganized and had a disheveled appearance. She indicated that a therapist was attempting to take her hostage and that foreign countries were attempting to assassinate her. |
| September 9, 2021 | Ms. Baldwin still presented as being disheveled and disorganized, as well as being agitated, in a dirty cell. She indicated that a therapist was holding her hostage, and she demanded a ticket to New York. |
| September 14, 2021 | Ms. Baldwin was lying on the cell floor; her cell was dirty with what appeared to be toilet paper torn into small shreds on the floor. Her pants, and underwear or sports bra, were around her ankles. She appeared shaky as if she had been crying. Jailer Liburd said that Ms. Baldwin did not "appear to be herself." |

### 2.     Medical Records / Death Reports

#### a.     Autopsy Report

17.     The office of Chief Medical Examiner, Tarrant County Medical Examiner's District, conducted an autopsy of Ms. Baldwin. The findings indicated in part that she had a history of anxiety and depression. They further indicated, pursuant to vitreous chemistry, that she had "severe hypernatremic dehydration." The listed cause of death was "severe hypernatremia, etiology undetermined." Stacy L. Murthy, M.D. was listed as the deputy medical examiner who apparently performed the autopsy. Hypernatremia is a high concentration of sodium in the blood.

#### b.     Custodial Death Report (Filed with Attorney General)

18.     Tarrant County filed a custodial death report regarding Ms. Baldwin with the Attorney General of Texas, which the County then amended. The report indicated that Ms. Baldwin was originally in custody of Tarrant County at 1:10 p.m. on April 27, 2021, and that she passed away at 11:09 a.m. on September 14, 2021. It further indicated that Ms. Baldwin was 52 years old. The County admitted that the medical cause of death was severe hypernatremia and that Ms. Baldwin had not been receiving treatment in the jail for severe hypernatremia. The report further indicated that Ms. Baldwin was deceased on arrival at a medical facility after being found. The listed offense for which Ms. Baldwin was being held was Terroristic Threat to a Peace Officer/Judge, but the report admitted that Ms. Baldwin did not barricade herself or initiate a standoff, physically attempt to or assault officers, attempt to gain possession of an officer's weapon, resist being handcuffed or arrested, gain possession of an officer's weapon, or escape or attempt to escape or flee from custody. The report also admitted that Ms. Baldwin exhibited mental health problems. The summary portion of the report indicated in part that Ms. Baldwin was housed in single cell 71A28 of the Lon Evans Corrections Center of the Tarrant County jail. The summary also indicated that, on September 14, 2021, at 10:09 a.m., a "medical code" was called when Ms.

Baldwin was found unresponsive in her cell. Ms. Baldwin was transported by Medstar Ambulance Service to John Peter Smith Hospital at 10:57 a.m., and she was pronounced deceased only one hour after being found unresponsive – at 11:09 a.m. Detective J. Brown and Crime Scene Investigator L. Clancy responded to investigate. Texas Ranger Dendy was notified and responded to investigate. The Ranger's investigation was to determine whether any potential criminal conduct led to Ms. Baldwin's death and not to determine whether there was any civil liability.

c.    Inmate Death Report (Filed with TCJS)

19.    Tarrant County also filed an Inmate Death Reporting form with the Texas Commission on Jail Standards ("TCJS") regarding Ms. Baldwin. That form indicated that Carla Singleton, a detention officer in the jail, made the last face-to-face contact with Ms. Baldwin on September 14, 2021, at 10:08 a.m.

3.    Texas Rangers Investigation

20.    As indicated above, the Texas Rangers investigated the decedent's death. The purpose of a Texas Rangers investigation regarding a custodial death, such as the decedent's, is to determine whether there was any criminal responsibility for what occurred. Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case. Therefore, the Texas Rangers' determination regarding whether to turn the case over to a grand jury and recommendation regarding prosecution does not determine whether Defendant is liable for the decedent's death.

21.    Ranger Dendy performed the criminal investigation related to Ms. Baldwin's death. He reviewed evidence including video footage taken inside the jail. He also interviewed two Tarrant County Sheriff's Office jailers and found "no criminal acts related to [the] investigation."

22.    Ranger Dendy arrived at the Lon Evans Corrections Center at approximately 12:08 p.m. on September 14, 2021. Tarrant County Sheriff's Office Jail Sergeant Raya escorted Ranger Dendy to the portion of the jail in which Ms. Baldwin was found unresponsive. Jail Sergeant Raya told Ranger Dendy that the "particular area houses the MHMR (Mental Health and Mental Retardation) inmates." Ranger Dendy met with Tarrant County Sheriff's Office Detectives Jerry Brown and David Bennett. Ranger Dendy learned from Detective Brown that the "cell was in a state of disarray with papers shredded and distributed all over the room." A photo of the interior of that cell is on the first page of this pleading. Detective Brown also told Ranger Dendy that there was not a camera in the cell.

23.    Ranger Dendy reviewed some video recordings and learned that, when cell checks were made, including those preceding when Ms. Baldwin was found unresponsive, no one would enter Ms. Baldwin's cell.

24.    Ranger Dendy and Detective Brown interviewed Jailer Jenkins. Jailer Jenkins indicated that she started her shift at 7:00 a.m. on the day that Ms. Baldwin was found unresponsive. Jailer Jenkins indicated that she worked on the same floor before and interacted with Ms. Baldwin during her incarceration. She said that Ms. Baldwin would not generally speak to her because Ms. Baldwin thought that Jailer Jenkins killed President Trump. When Jailer Jenkins checked Ms. Baldwin on the day she was found unresponsive, Ms. Baldwin did not have any pants on. Ranger Dendy reviewed Jailer Jenkins's written statement and concluded that there was not much detail regarding Jailer Jenkins' observations of Ms. Baldwin during the cell checks that day.

25.    Detective Brown and Ranger Dendy also interviewed Jailer Liburd. The "interview" apparently constituted Jailer Liburd reading her written report. She admitted that, while she had indicated in her written report that she conducted a cell check of Ms. Baldwin at

9:51 a.m., she actually conducted a check "prior to 9:51 a.m." During that "check," Ms. Baldwin was on the floor, and her pants were halfway down. Jailer Liburd said that it was not uncommon for Ms. Baldwin to sleep on the floor or not wear clothes. Jailer Liburd also indicated that, when conducting the 10:09 a.m. check, she saw that Ms. Baldwin's eyes were open, and Ms. Baldwin did not respond at that time.

26.    After completion of the interviews, Detective Brown, Detective Bennett, and Ranger Dendy went to the cell in which Ms. Baldwin had been incarcerated. Ranger Dendy wrote, "It was a mess with paper and items everywhere. "In accordance with the purpose of his investigation, Ranger Dendy wrote in his report, "I did not find any evidence of criminal acts resulting in Baldwin's death." Regarding the listed cause of death, Ranger Dendy also wrote that severe hypernatremia is "a high concentration of sodium in the blood, generally occurring when someone does not drink enough water…." He further wrote,

> In reviewing photos of Baldwin's cell, there is a water fountain fixed to the top of the toilet unit in the cell to the left of her bed. I researched hypernatremia to find the above explanation along with a further explanation that it usually occurs because of impaired mental judgement. Examples include someone with dementia.

Upon information and belief, Tarrant County was well aware of the relatively common issue of a person with impaired mental judgment potentially not ingesting sufficient water. Most, if not all, people housed in the same jail unit as Ms. Baldwin potentially had impaired mental judgment and would suffer from the same or similar issues.

C.    Tarrant County Liability Pursuant to *Monell*

1.    Introduction

27.    Plaintiffs set forth in this section additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658

(1978). Plaintiffs intend for all facts asserted in this pleading relating to policies, practices, and customs of the County to support such *Monell* liability claims, and not just facts and allegations set forth in this section. Policies, practices, and customs alleged in this pleading, individually or working together, and whether supporting conditions of confinement claims or episodic acts or omissions, were moving forces behind and caused the constitutional violations and damages referenced herein. These policies, practices, and customs are pled individually and alternatively. The County knew when it incarcerated the decedent that its personnel, policies, practices, and customs were such that it could not meet its constitutional obligations to provide medical and mental health treatment to, and protect, the decedent. The County made decisions about policy and practice that it implemented through its commissioner's court, its sheriff, its jail administrator, or through such widespread practice or custom that such practice or custom became the policy of the County as it related to its jail. The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the identity of chief policymaker(s) at the pleading stage. The Supreme Court has made it clear that there can be more than one policymaker.

28.     Plaintiffs list beneath this heading County policies, practices, and customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, or were moving forces behind damages referenced in this pleading. Thus, the County is liable for all such damages. These policies, practices, and customs worked individually, or in the alternative together, to cause damages referenced in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In the alternative, Plaintiffs plead episodic act or omission claims arising from policies, practices, and customs. Plaintiffs plead upon information and belief, to the extent necessary, that relevant actors engaged

in deliberate indifference underlying any episodic act or omission claims. Regardless, Plaintiffs

ask that the Court apply the correct law to the facts pled, as required by Supreme Court precedent.

2.     Tarrant County Policies, Practices, and Customs

29.     Courts have recognized that it is exceedingly rare for a plaintiff to have access to

or personal knowledge of specific details regarding the existence or absence of a municipal

defendant's internal policies or training procedures before discovery. Thus, at the pleading stage,

a plaintiff is merely required to put a governmental entity or private corporation on fair notice of

the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out

unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, which

give rise to conditions of confinement claims, or in the alternative episodic act or omission claims,

upon information and belief:

**Failing to Provide Emergency or Necessary Medical and Mental Healthcare**

- The County did not provide or delayed providing medical treatment, including mental healthcare, to detainees.

- The County had a policy, practice, or custom of failing to treat untreated mental illness as a medical emergency.

- The County had a policy, practice, or custom of failing to transport mentally ill detainees to a mental health facility despite being ordered to do so. Specifically with regard to Ms. Baldwin, the County repeatedly failed to transfer her to a mental health facility or otherwise provide necessary mental healthcare, which was an extended or pervasive practice given her continued confinement despite repeated observations of her suffering and mental health issues.

- The County did not provide or have a plan to provide medications to mentally ill detainees who refused to take prescribed medications. The County had a policy, practice, or custom of merely documenting a detainees' repeated refusals to take medication but not to take any other action to ensure detainees are receiving necessary care, including but not limited to mental health medications.

- The County had a policy, practice, or custom of failing to provide necessary treatment to mentally ill detainees when the County would not or could not transport those detainees for inpatient care, despite the fact that the Tarrant County jail houses more individuals with mental health needs than any other facility in the County. In Ms. Baldwin's case, this policy caused her suffering and death because proper mental healthcare would have addressed her needs and ensured she received proper medications and nutrients, *such as water*, to survive. Moreover, the visits Ms. Baldwin had with a mental health professional were woefully inadequate, amounting to 18 minutes during the last seven weeks of her life, plus one 15-minute appointment with MHMR during that seven week timeframe.

**Monitoring**

- The County did not adequately or effectually monitor detainees.

- The County's failure to adequately or effectually monitor detainees led to detainees, such as Ms. Baldwin, not receiving proper nutrients and care. Because they failed to adequately or effectually observe such detainees, County employees failed to notice when detainees, such as Ms. Baldwin, were not receiving necessary medical or mental healthcare or proper nutrients to stay alive.

- Upon information and belief, the County had a policy, practice, or custom of not regularly taking samples of electronic records of cell checks and comparing them to video recordings of the areas supposedly checked. This perpetuated the custom and practice of not conducting cell checks. This was alleged in a complaint in *Miller v. Tarrant County, Texas;* Cause No. 4:22-cv-00457; in the United States District Court for the Northern District of Texas, Fort Worth Division (the "Javonte Myers Case").

**Communications**

- The County had a policy, practice, or custom of allowing lax pass-down procedures. As alleged in the Javonte Myers Case, Jailer Esparza noted the paperwork from the shift preceding his was "okay," even though Javonte was lying in a cell deceased. Policy, practice, or custom was apparently such that, for example, oncoming shift jailers would not confirm with jailers on the prior shift that apparently sleeping prisoners were alive by observing their chests "rise and fall."

- As alleged in the Javonte Myers Case, the County had a policy, practice, or custom of rotating jailers in and out of special medical and mental health observation pods. This resulted in jailers not getting to know specific detainees and their specific needs. This worked together with the apparent policy, practice, or custom of not informing jailers of the medical or mental health needs or diagnoses of specific inmates.

### Understaffing

- The County had a policy, practice, or custom of understaffing its jail. The County contracted with CGL Companies to conduct a comprehensive review of its staffing needs and efficiences for the Tarrant County Sheriff's Office Detention Bureau (TCDB). CGL Companies issued a final report on March 23, 2021, well in advance of Ms. Baldwin's death, and thus the County had sufficient notice to remedy issues involving Ms. Baldwin's suffering and death. CGL Companies found that the existing Shift Relief Factor was too low and did not accurately reflect actual time away from jail posts for leave, training, or breaks. CGL Companies also found that the TCDB was "significantly understaffed." The entire TCDB had significant staffing issues. CGL Companies determined that Tarrant County had funded 975 employees, when 1,330 employees were needed. The Lon Evans Corrections Center (LECC) had significant staffing issues. Tarrant County had chosen to staff the LECC with 126 employees, which was 43 employees short of the staffing level recommended by CGL Companies. CGL Companies determined that the most critical vacancies were tied to facilities that housed the most difficult to manage detainees. Thus, CGL Companies wrote, "As the County moves to address any staff shortages it should prioritize its initial staffing efforts on filling vacancies at the Lon Evans Correctional Center." CGL Companies also wrote that LECC housed the most difficult-to-manage detainees. The company also noted that the LECC's facility design caused specific areas of concern. The u-shaped linear layout of housing areas created poor-sight lines. Further, "the ability to provide meaningful out-of-cell time, which is becoming a need for all detention systems, is problematic, given the lack of adjacent recreational space or dayroom space." CGL Companies determined that the LECC "has more intense staffing needs due to the fact it houses a higher custody population and inmates with special needs." CGL Companies determined that LECC lacked any "utility" or "escort" post to provide support to housing unit officers. As a result, when staff had to provide escorts, allow inmates out-of-cell time, take approved breaks, or perform other collateral duties, they were pulled from supervising inmates in cells. The LECC also only had one corporal post serving as the field training officer. CGL Companies determined that additional corporals were needd in LECC's command structure. CGL Companies also determined that, compared to jails across the coutry, TCDB had fewer detention officers per inmate. The average ratio of detainees to correction officers in the United States is 4.5 (1 jailer for every 4.5 inmates), while the ratio in the TCDB is 5.25 (1 jailer for every 5.25 detainees).
-

### Other Evidence of Policies, Practices, and Customs

- Dishonesty and apparent cover up are evidence supporting a finding of unconsitutional policies, practices, and customs. The County had a policy, practice, or custom of creating false observation records. When two jailers

worked an area, the County allowed one jailer to log in under his name, while allowing the other jailer to make entries. Likewise, the County would allow a jailer enter into electronic records actions supposedly taken by the other jailer. This was alleged in the Javonte Myers Case, which, similar to this case, involved a pretrial detainee who was found deceased in his cell in the Tarrant County jail.

- As alleged in the Javonte Myers Case, the County had a policy, practice, or custom of directing jailers to be sure that proper periodic indications of prisoner observations were recorded in electronic records, even if those observations were not actually made. Jail management wanted to be sure that the jail "looked good" to TCJS and other outside agencies, at the expense of the health and lives of detainees.

- When a policymaker knows about misconduct and fails to take remedial action, such inaction can support a finding that the policymaker acquiesced in the misconduct representing official policy, practice, or custom. The County may have failed to reprimand or take remedial action against employees or agents as a result of action or inaction related to damages suffered in this case, thus confirming that the policies, practices, or customs which led to the incident were in fact *de facto* policies of the County.

- Consistent testimony or behavior of jail employees or agents can also support a finding of official policy, practice, or custom. County employees acted consistently in their actions or inaction related to Ms. Baldwin's suffering and death, thus confirming that the policies, practices, and customs that led to Ms. Baldwin's suffering and death were in fact *de facto* policies of the County.

### 3.    TCJS Records Demonstrating County Practices and/or Customs

30.    TCJS reports regarding other incidents or areas of noncompliance with TCJS standards can show policies, practices, and customs. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove their claims at trial or in response to a motion for summary judgment. That standard applies equally to TCJS reports regarding which Plaintiffs may obtain more information through discovery. Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance

of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. TCJS reports and documents regarding inspections of County jails further demonstrate the above enumerated and other policies, practices, and customs which, when applied individually or working together, caused, were proximate causes of, or were producing causes of damages and death asserted in this pleading.

31.     On May 19 through 21, 2014, TCJS inspected the Tarrant County jails. The TCJS inspector reviewed a random selection of 50 files, training records, and policies related to health services in the jail and interviewed staff and inmates. While reviewing inmate folders, the TCJS inspector determined that medical paperwork in inmates' files should have been in their medical files. TCJS inspectors indicated that they would follow up in 30 to 90 days to ensure that all medical records, such as special medical housing assignments, inmate requests for medical services, and mental health services requests were maintained in inmates' medical folders and not in inmate custody files. This was a very important issue, as jailers and others in the jail needed to be informed of detainees who needed special services, such as the decedent.

32.     On March 23, 2015, TCJS inspected the jails again. As a result of the inspection, the Tarrant County jail was listed as being noncompliant with TCJS minimum standards. The TCJS inspector determined that deficiencies existed. Upon information and belief, the inspection, based on a special inspection report related to it, resulted from the death of an inmate. Documentation received and reviewed by TCJS revealed that Tarrant County jailers were not completing visual face-to-face observation of all inmates at least once every 60 minutes as required by minimum jail standards. It appears that Tarrant County's failure to do so led to the death of an inmate. This was notice, well before the decedent's death, that appropriate checks and observation of inmates were critical. Moreover, the inspection report indicated the apparent custom and practice at the jail.

33.     Between April 13 and 16, 2015, TCJS inspected the jails once again. The TCJS inspector found, regarding health services, that the jail needed to ensure that a a magistrate is notified when an inmate may be suffering from a mental illness or mental impairment. After reviewing documentation regarding inmates suspected of suffering from mental illness, the TCJS inspector determined that there was an incident in which MHMR felt that the magistrate should have been notified but there was no corresponding documentation to prove that the notification ever took place. As a result, jail staff had to begin attaching the following documents together: Continuity of Care Query return, mental/medical intake screening form, MHMR services request, and notification to a magistrate.

34.     Between May 23 and 26, 2016, TCJS inspected the jails once again. When reviewing inmate files, the TCJS inspector found that some admission files were being kept with inmate medical paperwork. The inspector noted that such items should have been kept separate, in the medical section of the file. The inspector also noted that the majority of operational plans for the jail were last approved in year 2000 - almost 16 years before. The inspection team provided notes and suggestions for updates to operational plans and indicated that they would follow up with jail administration over the next 30 to 90 days to review progress on completion and submission of all operational plans.

35.     Between April 17 and 19, 2017, TCJS inspected the jails again. After reviewing a random sample of 50 inmate files, interviewing staff, and reviewing policy related to admission to the jail, and specifically after reviewing holding and detox cell face-to-face observation documentation, the inspection team observed that jail staff exceeded the 30-minute between check requirement for typical inmates and not those who are exhibiting bizarre behavior or need medical assistance, by as few as two minutes and by as many as eight minutes. As a result, the inspection

team requested random audits to be submitted for a review during the following 90 days. However, as Plaintiffs have alleged and shown elsewhere in this complaint, the fact that observations were recorded in Tarrant County records was insufficient to prove that such observations actually occurred. In fact, it was a custom and practice to record observations and cell checks even though such observations and cell checks had not necessarily occurred.

36.     Between March 25 and 27, 2019, TCJS inspected the jails again. While reviewing the County's mental disability/suicide prevention plan, the inspectors determined that the duration and frequency of suicide prevention training for jail employees was not included. Thus, there was no requirement for how much training - and how often - jail staff would receive related to preventing and recognizing suicide. The inspectors noted that jail administration was "currently working on a plan of action for more overall training for jail staff to include suicide recognition/detention." The inspectors required that jail administration email to the inspectors a copy of the plan of action, including the duration and frequency of suicide recognition/detection training once such was approved by TCJS. This shows that the County gave short shrift to the mental health needs of detainees in the County jail.

37.     Between February 24 and 26, 2020, TCJS inspected the jail again. While reviewing health services documentation, the TCJS inspection team discovered that, on six occasions, the suicide screening form was not completed in its entirety. The inspection team noted the importance of ensuring that each box on the form be checked or answered, as dictated by the form. Inspectors required follow-up action, in that TCJS Inspector Jouett would identify screening forms that he wanted to review. Jail administration would then scan and email the forms to Inspector Jouett. This procedure would occur over the next 30 to 90 days. If any deficiencies were noted, TCJS would

issue a notice of noncompliance to the jail. This further shows that the County gave short shrift to the mental health needs of detainees in the County jail.

38.    On May 21, 2020, TCJS conducted a special inspection of the jails. Upon information and belief, the inspection occurred as a result of the death of inmate Dean Stewart. As a result of the inspection and Mr. Stewart's death, the Tarrant County Jail was found to be noncompliant with minimum jail standards. After reviewing video evidence and documentation, the TCJS inspector determined that face-to-face observations and discovery of Mr. Stewart exceeded the 30-minute mandate by 12 minutes. Thus, fewer than 30 days before the death of the decedent, Tarrant County Jail administration, including the jail administrator and the Tarrant County sheriff, were put on notice - once again - of the importance in ensuring that observations and cell checks were actually made. Based upon this information and prior inspections, they knew that simply recording information in the system regarding cell checks did not mean checks actually had occurred. Regardless of this information, the customs and practices referencing this pleading continued in the jail.

39.    Only six days later, on May 27, 2020, TCJS inspected just a portion of the jails. After reviewing four days of electronic round logs and housing areas where 30-minute observation/rounds are mandated, the TCJS inspector noted that there were no issues or violations. This allowed the Tarrant County jail, only six days after the prior inspection, to be compliant again. However, as shown elsewhere in this pleading, the fact that such electronic round logs indicated that cell checks were done did not in fact actually mean they had occurred. According to one Defendant in this case, as referenced in this pleading, jail staff all the way up from jailers through at least lieutenants, and upon information and belief possibly the Sheriff, stressed only making

sure that cell checks were recorded and not that the checks themselves actually occurred. This was the custom and practice in the jail.

40.     Between March 8 and 12, 2021, TCJS again inspected the jails. The results indicate customs and practices at the jail preceding Ms. Baldwin's death. When inspectors reviewed health services documentation, the inspection team discovered that on four occasions a magistrate was not notified within 12 hours when an inmate likely had mental health issues as required by the Texas Code of Criminal Procedure. As a result, jail staff had to scan and email the lead inspector 20 forms every Friday for the following 30 to 90 days. If there were any deficiencies, TCJS would issue an additional notice of noncompliance.

41.     The above-referenced inspection resulted in the Tarrant County Jail being listed on the TCJS website as noncompliant. Inspectors also reviewed a random selection of officer Texas Commission on Law Enforcement certification records and officer documentation and interviewed staff. While specifically reviewing 30-minute and 60-minute face-to-face observations, the inspectors determined that the Guard 1 electronic cell check system automatically indicated "out of compliance" on documentation when a jailer would go over the 20-minute or 40-minute internal facility policy required timeframe. Oddly, TCJS inspectors advised the jail on potential legal liability since the TCJS had 30-minute and 60-requirements, and the jail allegedly had corresponding 20-minute and 40-minute requirements. TCJS advised the jail to remove the "out of compliance" wording to "reduce possible liability." The inspection report indicates that jail "staff agreed." In fact, oddly, TCJS inspectors required jail staff to notify the inspector when the "out of compliance" verbiage had been removed from the Guard 1 system. There was absolutely no state interest in such a requirement, other than protecting Tarrant County from civil liability.

42.     TCJS inspected Tarrant County jails again from May 23 through 27, 2022. When reviewing restraint documentation for pregnant detainees, the inspection team determined that three pregnant detainees had been restrained on four occasions. It appears that appropriate approval had not been obtained in perhaps three of four instances, although TCJS paperwork is ambiguous regarding this issue. Restraining pregnant detainees in such a manner shows deliberate indifference and lack of care regarding the health and safety of detainees. When walking through the Tim Curry Justice Center holding cells, inspectors noted an inoperable intercom on the seventh floor. TCJS reminded staff of the importance of checking two-way communication on a regular basis. There was also discussion about the current jail staff shortage of 133 correctional officers. The Tarrant County jail, in order to attempt to meet TCJS standards, has had to institute a standard work week of 52 hours. Thus, jailers who have to work such long hours are likely consistently tired and overworked and potentially give short shrift to their duties.

### 4.     Tarrant County Jail Suffering and Deaths Show a Custom and Pattern of Indifference

43.     Other suffering and deaths in Tarrant County jails support findings of conditions of confinement created by Tarrant County's adoption, or failure to adopt, policies, practices, and customs, and County approval of unconstitutional policies, practices, and customs. Repeated instances of detainee suffering and death, as have occurred in Tarrant County jails, can support findings of policies, practices, and customs, including but not limited to, in relevant part, failures to monitor, failures to provide or to provide timely necessary medical and mental healthcare, and understaffing. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of

detail that would be required to prove their claims at trial or in response to a motion for summary judgment. That standard applies equally to other incidents in Tarrant County jails regarding which Plaintiffs may obtain more information through discovery. Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility.

44.     On October 18, 2010, Betty Rodgers turned herself in to the Tarrant County Corrections Center, where she informed jail staff that she had cirrhosis of the liver and ulcers that would bleed profusely if she were not given her medication. Upon information and belief, jail staff ignored Betty's consistent requests for medication and refused to let her see a doctor. Because Betty did not receive her medication for days, she began vomiting blood, became lightheaded from blood loss, blacked out, hit her head on a metal table, woke up to blood everywhere in her cell, and then pressed the help button. The guard responding to the call simply looked into her cell and then left. Betty later received emergency treatment for her ulcers and head wound.

45.     On January 11, 2011, James Hemphill, who used a wheelchair and had a known history of seizures and delirium tremens, was on suicide watch at the Tarrant County jail and therefore under 10-minute interval cell checks. Jail staff noted that James was on the floor from 8:03 P.M. to 10:54 P.M., but did not enter the cell to check on him. At 11:41 P.M., another jailer noted that James was unresponsive on the floor, started CPR, and called for medical assistance. James could not be revived and was later pronounced dead.

46.     On May 24, 2011, Kaleb Fitzgerald was found in a Tarrant County jail cell with his uniform tied around his neck. He was taken to the hospital and put on life support but eventually was pronounced dead on June 1, 2011. The custodial death report does not include whether he was on suicide watch, whether he made suicidal statements, whether jailers checked on him in

accordance with jail standards, or whether there were any other details related to his death, but discovery may reveal some or all of these details.

47.     On or about July 16, 2011, Mike Martinez, a Tarrant County jail inmate with a history of diabetes and liver cirrhosis, complained about stomach pain, did not get out of his bunk all day, and did not eat his meals or take his medication. That night, he was discovered unresponsive in his cell and later pronounced dead.

48.     On March 19, 2012, Johnathan Holden was found in a Tarrant County jail cell with a blanket wrapped around his neck. He was pronounced dead the next day. On or about March 5, 2012, Jonathan was booked into the Tarrant County jail on a nonviolent burglary charge. Upon information and belief, Jonathan's medical intake noted that he took prescription medication for schizophrenia, had attempted suicide three weeks prior, required a competency evaluation, and required a suicide prevention cell. On or about March 16, 2012, jail doctors recommended that Jonathan be transferred to an area at the Correction Center for low-to-medium-risk inmates. Instead of following this recommendation, jail staff transferred Jonathan to the Belknap Unit, a maximum-security unit that houses dangerous high-risk inmates. Jonathan was housed in a cell near another inmate, Steven Nelson, whom jail staff knew was strong, violent, schizophrenic, unmedicated, incarcerated for murdering a preacher, frequently in and out of solitary confinement, and had a history of assaulting other inmates in the jail (including "gassing" other inmates by spraying them with a mixture of his feces and urine). Despite this information, jail staff allowed Nelson to be outside his cell without supervision while armed with a broom and blankets. On March 19, 2012, Nelson used the broom to provoke Jonathan and then fashioned a noose with blankets, placed the noose around Jonathan's neck, and lifted him off the ground. Jail staff later

found Jonathan hanging from the cell bars with the blanket around his neck. He was pronounced dead the next day.

49.    On June 24, 2012, Irvin Dorsey, who had a known history of strokes, was found in his cell at the Tarrant County jail in need of medical attention. The next day he was pronounced dead. The custodial death report lists the cause of death as a hemorrhagic stroke. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

50.    On April 16, 2013, Bernard Eaglin was booked into the Tarrant County jail. Bernard was transferred to the medical floor on May 1, 2013 and then transferred to the hospital on May 15, 2013. Bernard died at the hospital from sepsis. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

51.    On May 22, 2013, Eduardo Salazar was transported to the Tarrant County jail and housed on the medical floor. On May 26, 2013, Eduardo was transported to a hospital following a reported fall. The same day, he was transported back to the jail and returned to the medical floor. On June 4, 2013, Eduardo was again transported to the hospital following another reported fall and a seizure. He was later pronounced dead. The custodial death report lists the cause of death as blunt force trauma of the head due to ground level fall. Discovery may reveal whether failures to adequately monitor or provide necessary medical care contributed to this detainee's death.

52.    On or about December 12, 2013, Robert Simmons, who was housed in a single cell in the Tarrant County jail, was found unresponsive and later pronounced dead. The custodial death report lists the cause of death as heart disease, but does not give any further detail about what happened. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

53.     On September 12, 2014, a nurse at the Tarrant County jail was passing out medication when she found that William Diener III was unresponsive, not breathing, and had no pulse. The custodial death report lists the cause of death as heart disease, but fails to include any information regarding whether William exhibited any signs that he needed emergency medical help earlier. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

54.     On November 4, 2014, Nathan Crawford was found in his Tarrant County jail cell with a blanket wrapped around his neck. Nathan was taken to the hospital where he died a few days later. The custodial death report does not give any information about whether Nathan made any suicidal statements, whether he suffered from any mental illness, or whether cell checks were performed in accordance with minimum jail standards. Discovery may reveal whether Tarrant County employees adequately monitored Nathan.

55.     On March 11, 2015, Larry Crowley was booked into the Tarrant County jail and was cleared by MHMR to be housed in a single cell with MHMR to follow up at a later time. While passing food trays, jailers found Larry lying face down on the cell floor. Soon after, medical personnel pronounced him dead. The custodial death report lists the cause of death as suicide, but fails to include whether Larry exhibited any mental health problems, whether he made any suicidal statements, whether he was on suicide watch, how long he was lying there before he was found, or whether there were any other issues related to his death. Discovery may reveal whether necessary medical or mental healthcare was withheld or delayed by Tarrant County employees and whether Tarrant County employees adequately monitored Larry.

56.     On April 9, 2015, Tarrant County jail staff found Joseph Wilson lying on the floor of his cell in a pool of blood coming from an apparent self-inflicted cut to his arm with a razor

blade. Joseph was later pronounced dead. Discovery may reveal whether Tarrant County employees adequately monitored Joseph.

57.    On or about June 7, 2015, John Polk II was found in his cell at the Tarrant County jail mumbling and unable to stand. He was later pronounced dead, and the cause of death was a brain hemorrhage. The custodial death report does not include any details regarding what caused the brain hemorrhage. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

58.    On September 23, 2015, Tarrant County jailers arrived at the door of Krisha Blackwell's cell and called for her to get her breakfast tray. When Krisha did not respond, one jailer tapped her foot on the cell door, and the other jailer tapped metal keys on the door. When Krisha still did not respond, the jailers noted she refused breakfast and moved on without going in to check on her. More than an hour later, medical staff distributing medications similarly could not get a response but continued distributing medications to other cells without checking on Krisha. After they finished, the jailers went into Krisha's cell and realized she was not breathing. Krisha was later pronounced dead, and the cause of death was associated with her known seizure disorder.

59.    On October 17, 2015, Lupita Hernandez knocked on her cell door and called out for attention, but Tarrant County jail staff told her to wait. Lupita called out the jailer's name again, and as the jailer approached the cell, Lupita collapsed on the floor. She was later pronounced dead. The cause of death was related to diabetes. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

60.    On November 8, 2015, Andrew Canfield was found hanging by his clothes from the restroom bars in the cell. Andrew was pronounced dead the next day. The custodial death report does not state whether Andrew was on suicide watch or whether he had exhibited or was being

treated for any mental health problems. Discovery may reveal whether necessary medical or mental healthcare was withheld or delayed by Tarrant County employees and whether Tarrant County employees adequately monitored Andrew.

61.    On or about October 18, 2017, Billy Freeland was booked into the Tarrant County jail, where he informed jail staff that he had a history of alcohol abuse. Billy's family members reportedly informed jail staff that Billy would likely suffer side effects from alcohol withdrawal. On October 20, 2017, jail staff noted that Billy was naked in his cell, uncooperative, agitated, talking to and picking at the walls, and yelling at staff. On October 23, 2017, jail staff noted that Billy was lying on the cell floor, experiencing hallucinations, arm tremors, and labored breathing, and he was disoriented, combative, and resistant. Billy was later taken to the hospital, where it was discovered that he was suffering from acute respiratory and renal failure and was essentially unresponsive. He was placed in intensive care, but never regained consciousness and died on November 4, 2017.

62.    On or about February 9, 2018, Robert Renfrow was transported from the Tarrant County jail to the hospital due to chest pains. Robert was later pronounced dead. The custodial death report lists his cause of death as acute respiratory distress, but fails to explain whether Robert had any related underlying illnesses, whether he was taking any medication, whether he exhibited any signs that he needed emergency medical treatment earlier, or whether there were any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

63.    On November 7, 2018, Clinton Don Simpson was beaten to death by another inmate, David Flores, in the Tarrant County jail. Though Simpson and Flores were both classified as suicidal, jail staff housed both inmates together. Discovery may reveal whether necessary

medical or mental healthcare was withheld or delayed by Tarrant County employees and whether Tarrant County employees adequately monitored Simpson and Flores.

64.    On January 10, 2019, Jennifer Espinoza was booked into the Tarrant County jail, where medical staff determined that she was detoxing from heroin. On January 16, 2019, Jennifer was found in her cell unresponsive and was later pronounced dead. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

65.    On April 4, 2019, Derick Wynn was booked into the Tarrant County jail. During the booking, housing, arraignment, and rehousing processes, Derick was combative and resisting jail staff, who used oleoresin capsicum spray and various restraints on Derick. During the rehousing process after arraignment on April 5, 2019, Derick experienced a medical emergency in his cell and was later pronounced dead. The cause of death was a drug overdose. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

66.    On July 26, 2019, Southany Khiengsombath, who was transferred from the Tarrant County jail to the John Peter Smith Hospital on July 8, 2019, was pronounced dead. The custodial death report gives little information about how this death occurred. It lists the cause of death as cardiac arrest, but also later mentions meningitis, encephalitis, and rhabdomyolysis. It also notes that Southany was placed on suicide watch because he made statements that he wanted to die, but another portion of the report provides "no" to the questions "make suicidal statements?" and "exhibit any mental health problems?" Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees or whether this detainee was adequately monitored.

67.    On July 31, 2019, Robert Miller, who was being booked into the Tarrant County jail, got into an altercation with the officers and was pepper sprayed. Robert was found in his cell

unresponsive about an hour later and was pronounced dead the next day. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

68.     On August 31, 2019, Jackson Murphy, who reported medical concerns of diabetes and hypertension at the time of booking into the Tarrant County jail, was pronounced dead. The custodial death report lists the cause of death as heart failure and explains that Jackson was taken to the hospital on July 22, 2019, then brought back to the jail on July 24, 2019, and then taken back to the hospital on August 6, 2019, but the report fails to note why Jackson was taken to the hospital, whether he was taking his medications, or whether he exhibited signs he needed emergency medical treatment. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

69.     On February 26, 2020, Ricky Farmer, who exhibited mental health problems and was housed in a single cell in the Tarrant County jail for his protection, was found lying on the floor of his cell. He was later pronounced dead. The custodial death report filed in June, far beyond the 30-day state law deadline, lists the cause of death as lack of oxygen but does not explain how the death occurred. Discovery may reveal, among other things, whether necessary medical or mental healthcare was withheld or delayed by Tarrant County employees.

70.     On April 6, 2020, Dean Stewart was booked into the Tarrant County jail, classified as suicidal, and placed in a single cell for his protection. On April 26, 2020, Dean was found dead in his cell by suicide. On May 21, 2020, TCJS found the Tarrant County jail out of compliance with minimum observation standards because the Tarrant County jail failed to conduct checks on Dean at least every 30 minutes, leaving him alone for nearly an hour and checking on him late at least 3 times. Not long before Javonte Myers' death, the Tarrant County Sheriff's office was - once again - put on notice of serious issues with its customs and practices related to inmate observation

and care. This "last chance" to remedy these issues unfortunately was passed by with continued deliberate indifference. This opportunity came as a result of the death of Dean Stewart. Upon information and belief, in the five-hour period before his death, cell checks were conducted late, missing even a 30-minute timeline by 20 minutes or more, missed entirely, or conducted in a manner that was inconsistent with all known jail practices. Checks, as with Javonte, were not conducted in face-to-face ways that are consistent with all known jail practices. Instead, one or more jailers merely walked by the cell and did not even look in. One Sergeant with the Tarrant County Sheriff's department said that three specific jailers "failed to complete the face-to-face observations, which resulted in the death of an inmate and their actions were both incompetent and deficient."

71.    Further, upon information and belief, the Sheriff's department learned from Dean's death that "each floor and officer conducted face-to-face observations differently." Moreover, upon information and belief, three jailers involved in Dean's death admitted to violations of apparent written policy, but argued that their "violations" were not violations of custom and practice due to them being trained to do things the way that they did.

72.    On May 17, 2020, Chasity Congious, a female inmate at the Tarrant County jail who suffers from mental health disorders and developmental disabilities, gave birth in the Tarrant County jail without jail staff's knowledge. According to the federal lawsuit filed on January 13, 2022, jail staff knew that Chasity was pregnant, had severe mental health problems, was often nonverbal, would be unable to express symptoms of labor, and would not recognize if she were to go into labor. Nevertheless, she was returned from medical to the jail. Jail staff eventually found Chasity bleeding in her cell and the baby with the umbilical cord around its neck. Though Chasity survived, the baby died within days.

73.     As indicated elsewhere in this pleading, on or about June 19, 2020, Javonte Myers died in a Tarrant County jail. Javonte Myers was deceased, on the cell floor, for hours before anyone entered the cell. Allegations regarding what led to Javonte Myers' death are included in a complaint filed in the Javonte Myers Case.

74.     On June 24, 2020, Jason Martin experienced an unknown medical emergency, collapsed at the Tarrant County jail, and was later pronounced dead. The custodial death report lists the 40-year-old's cause of death as heart disease, but fails to state whether Jason had been complaining, whether he took medication, or whether there were any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

75.     On June 26, 2020, Abdullahi Mohamed, who exhibited mental health problems and was housed in a single cell at the Tarrant County jail, was pronounced dead. The facts surrounding his death are unclear. Abdullahi's family claims they were told that he died after some kind of confrontation with the guards in the jail. The custodial death report, however, states that Abdullahi was lying on his mattress on the floor naked, failed to answer jail staff's questions, did not eat his food, and became unresponsive and stopped breathing while in a wheelchair on the way to medical. The report further states that the 41-year-old's cause of death could not be determined. Discovery may reveal whether necessary medical or mental healthcare was withheld or delayed by Tarrant County employees.

76.     On September 8, 2020, another inmate alerted Tarrant County jail staff that Dalanna Price was not breathing. When jail staff checked on Dalanna, they found her dead in her cell. The amended custodial death report lists the cause of the 44-year-old's death as heart disease, but fails to notify the public as to whether Dalanna had been checked periodically as required by TCJS,

whether she had been ill, whether she was on medication, or whether there are any other issues related to her death. Discovery may reveal whether necessary medical care was withheld or delayed or whether Dalanna had been adequately monitored by Tarrant County employees.

77.    On September 14, 2020, 34-year-old Andre Wilson was found lying on the floor of his cell. The custodial death report lists the cause of death as cardiomegaly, but fails to give any details about what happened, whether he had been checked on periodically, whether he had been ill, whether he was on medication, or whether there are any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed or whether Andre had been adequately monitored by Tarrant County employees.

78.    On November 10, 2020, Kennie Craven was found unresponsive in his bed at the Tarrant County jail. He was later pronounced dead. The custodial death report lists the cause of death as heart disease, but fails to give any details about what happened, whether Kennie had been checked on periodically, whether he had been ill, whether he was on medication, or whether there were any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed or whether Kennie had been adequately monitored by Tarrant County employees.

79.    On December 17, 2020, a Tarrant County jailer found inmate Jared Chapman hanging by a bedsheet from the ceiling of cell 41, but called for suicide assistance to cell 59. As the initial jailer was not at cell 59, the jailers had to yell to find each other. Once the backup jailer got to cell 41 and asked what was wrong, the initial jailer just pointed to Jared hanging in the cell. The backup officer immediately attempted to help Jared, but the initial officer "just stood there." Additional jail staff arrived thereafter but were unable to use their 911 Rescue Tool as it was already in use upstairs. Jared later died of his injuries. Discovery may reveal whether necessary

mental healthcare was withheld or delayed or whether Jared had been adequately monitored by Tarrant County employees.

80.    On December 19, 2020, Tarrant County jailers called a medical code for Lee Haney, who was complaining of shortness of breath, at 4:30 a.m. Around 6:15 a.m., medical staff called for an ambulance to take Lee to a hospital. Around 11:21 p.m., Lee was pronounced dead. The custodial death report lists the 34-year-old's cause of death as a pulmonary embolism, but fails to state whether Lee had complained previously, whether he had any history of blood clots or medical issues involving his lungs, or whether there are any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

81.    On March 21, 2021, DeAnthony Taylor, who had a history of mental health problems, hypertension, hepatitis C, thyroid problems, and diabetes, was found unresponsive in his cell and was later pronounced dead at the Tarrant County jail. The custodial death report lists the cause of death as heart disease, but fails to note whether he was on medication, whether he had complained to jailers, or whether there were any other issues related to his death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

82.    On July 20, 2021, Jeffrey Buchanan, who had a history of hyperthyroidism and hypotension and had exhibited mental health problems and made suicidal statements, but was housed in a multiple occupancy cell in the Tarrant County jail, was found having a seizure. After being transferred to medical and then a hospital, he was pronounced dead. The custodial death report lists his cause of death as cardiomegaly, but fails to state whether Jeffrey exhibited any warning signs of having a seizure, whether he had any history of seizures, whether any event or situation brought on the seizure, or whether there were any other issues related to his death.

Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

83.     On August 15, 2021, Jeremiah Noble, housed in a single cell in the Tarrant County jail, was found hanging by a mattress over in his cell. A few days later, he was pronounced dead. The custodial death report does not state whether Jeremiah was on suicide watch, whether cell checks were completed in accordance with jail standards, or whether there were any other issues related to his death. Discovery may reveal whether Tarrant County employees adequately monitored Jeremiah.

84.     On September 5, 2021, Tarrant County jail staff booked Tyler Huffman and discovered he was detoxing from unknown narcotics and had high blood pressure. Sometime after 10:00 p.m. on September 9, 2021, Tyler died in his cell from heart complications. Jail staff found Tyler around 6:00 a.m., and EMS pronounced him dead at 6:41 a.m. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

85.     On October 30, 2021, Leon Jacobs, who had known health issues, including Wolff-Parkinson-White Syndrome, chest pain, and shortness of breath, was pronounced dead. He was booked into the Tarrant County jail on September 14, 2021, and tested positive for COVID-19 on September 27, 2021, but was not taken to the hospital until October 6, 2021. The custodial death report filed November 9, 2021 states the cause of death as pending autopsy results. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

86.     On January 1, 2022, Alvie Johnson, a man accused of killing his daughter, was found unconscious in his Tarrant County jail cell with a head injury possibly from a ground level fall. Alvie was taken off life support and pronounced dead a few days later. The custodial death report filed by the Tarrant County Sheriff's Office reports the cause of death as pending autopsy

results and does not include any other information regarding how the death occurred, including whether Alvie was on suicide watch. Discovery may reveal whether Tarrant County employees adequately monitored Alvie.

87.    On February 25, 2022, Edgar Villatoro-Alvarez, who had exhibited mental health problems and was only 40 years old, experienced some sort of medical emergency at the Tarrant County jail and was later pronounced dead. The custodial death report filed by the Tarrant County Sheriff's Office reports the cause of death as pending autopsy results and fails to include any other details regarding how the death occurred, what medical emergency Edgar experienced, whether he had been on periodic observation, or whether he complained or exhibited any signs that he needed emergency medical treatment. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees or whether Edgar was adequately monitored.

88.    KERA News published an article on October 7, 2020 regarding deaths in the Tarrant County jail. The headline read, "Tarrant County Sheriff Bill Waybourn is running for re-election, and he's taking heat for the 10 inmates who died in his jail so far this year. COVID-19 is responsible for only one of those deaths." Shockingly, the second sentence in the article read, "Waybourn attributes the increase to fate, and what he says is the relative ill health of the people who enter his jail." This does not pass constitutional muster. The article mentions Dean Stewart's death and the Tarrant County jail losing its state certification as a result. The article also mentions that, shortly after Mr. Stewart died, a prisoner actually gave birth inside of her jail cell, and no one knew about it. The baby died, and the mother was taken to a mental health facility. Her family said that she should have been in the mental health facility in the beginning.

89.    Timothy Mathew Rasor was transported to a local hospital on February 22, 2021, for a life-threatening medical event. He had been booked into a Tarrant County jail a few months

before. Mr. Rasor was pronounced deceased on February 22, 2021, and an autopsy was to be conducted. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

90.    Trelynn Dmaun Wormley, twenty-three years old, was booked into a Tarrant County jail on January 25, 2022. An inmate medical emergency code was called for Mr. Wormley at 2:52 p.m. when fellow inmates indicated that Mr. Wormley was having difficulty breathing. He was transported to a local hospital and passed away apparently on the same date. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

91.    On May 2, 2022, the Tarrant County Sheriff's Office issued a press release noting that the Tarrant County jail houses more people with mental health needs than any other facility in the County. At that time, there were 138 people in the Tarrant County jail waiting for a bed in the state mental health hospital. Discovery may reveal that the County lacked the necessary policies, practices, and customs to provide adequate care for such individuals.

92.    Oh Young Park was a detainee in a Tarrant County jail on June 16, 2022. A detention officer found Mr. Park hanging from a makeshift ligature in his cell during a cell check. Mr. Park passed away on June 17, 2022. Discovery may reveal whether necessary mental healthcare was withheld or delayed by Tarrant County employees or whether this detainee was adequately monitored.

93.    Thomas Simpkins was a detainee in a Tarrant County jail. Mr. Simpkins was booked in on May 23, 2022. Mr. Simpkins was transferred to a local hospital after fainting at the jail on June 21, 2022, and he was pronounced deceased a few days later. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

94.     Richard Marta was booked into a Tarrant County jail on July 28, 2022. Mr. Marta tested positive for COVID-19 and was transported to a local hospital. Mr. Marta eventually passed away after being removed from life support. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

95.     Lyonell Mitchell was booked into a Tarrant County jail on or about September 10, 2022. He was found unresponsive in his cell on September 14, 2022, and transported to a local hospital where he was pronounced deceased. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

96.     Kenneth Ray Perry was booked into a Tarrant County jail on September 27, 2022. Mr. Perry was found unresponsive in his cell on September 29, 2022, and was pronounced deceased apparently by a medic at the scene. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees or whether this detainee was adequately monitored.

97.     Antonio Stahl Deluca passed away after being in a Tarrant County jail. Mr. Deluca was booked into a Tarrant County jail on November 10, 2022. A few days later, a medical code was called for Mr. Deluca because he did not look well and was complaining of chest pain. Mr. Deluca was transported to a local hospital and ultimately pronounced deceased. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

98.     George William Zink was incarcerated in a Tarrant County jail. On February 15, 2023, a detention officer notified a Tarrant County jail medical team that Mr. Zink had not eaten lunch or dinner. Mr. Zink was then taken to the medical floor. Medical personnel then requested an ambulance to transport Mr. Zink to a local hospital. However, even before the ambulance arrived, medical personnel had to begin CPR. Mr. Zink was pronounced deceased at a local

hospital the same day, and an autopsy was conducted. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

99.    Heidiann Renee Gitts was incarcerated at a Tarrant County jail, and she passed away on March 20, 2023, at a local hospital. Ms. Gitts was transported to a local hospital after experiencing a medical emergency in the shower area of her pod. Ms. Gitts had been incarcerated for only a couple days, and she was only 32 years old at the time of her death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

100.    Jason Levar Jackson was incarcerated in a Tarrant County jail. He was booked into the jail on March 18, 2023, and he died five days later at a local hospital. Mr. Jackson had been transported to the local hospital via ambulance on March 23, 2023, after experiencing a medical emergency in his jail pod. Mr. Jackson was only 36 years old at the time of his death. Discovery may reveal whether necessary medical care was withheld or delayed by Tarrant County employees.

III.    Causes of Action

   A.    Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

101.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the Fourteenth Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was applicable in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among

the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental healthcare, to be protected from harm, and not to be punished at all also arise under the Fourteenth Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

102.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply to any appropriate claims in this case and all pretrial detainee cases arising under the Due Process Clause of the Fourteenth Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to any appropriate constitutional claims in this case. The court should not apply a subjective state of mind or deliberate indifference standard to any claims in this case. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

103.    This *Kingsley* section potentially applies, depending on the current status of the law, only to any claims that ultimately might be asserted against natural persons, or any episodic act or omissions claims against the County. Plaintiffs make no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to prove conditions of confinement claims against the

County. Further, Plaintiffs currently have no intent to seek to add any natural persons as defendants to this case.

B.    Remedies for Violation of Constitutional Rights

104.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs individually, and Jonathan Mattix for and on behalf of all wrongful death beneficiaries and Claimant Heirs, seek, for causes of action determined to be asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and supporting case law. If the decedent had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law. Plaintiffs incorporate this remedies section into all sections in this complaint determined to be asserting cause(s) of action.

C.    Cause of Action Against Tarrant County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

105.    In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant is liable to Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical or mental healthcare, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth

Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiffs rely on the Court to apply the correct constitutional guarantee(s) to facts pled.

106.    The County's employees and agents acted or failed to act under color of state law at all relevant times. The County's policies, practices, and customs were moving forces behind and caused, were producing causes of, or were proximate causes of damages, including death, referenced in this pleading.

107.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County commissioners' court was the relevant chief policymaker.

108.    The County was deliberately indifferent regarding policies, practices, and customs developed or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act or omissions claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time any court makes the determination. Deliberate indifference is not an element of a conditions of confinement claim. The County also acted in an objectively unreasonable manner. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference (if legally necessary) to the known or obvious consequences that constitutional violations would occur. Once

again, by including the "deliberate indifference" allegation, Plaintiffs are not conceding or alleging

that deliberate indifference is a necessary element of a conditions of confinement claim. It is not.

109.    Therefore, the decedent's estate and her heirs at law (Claimant Heirs) suffered the

following damages, for which they seek recovery from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

110.    Plaintiffs also individually seek and are entitled to all remedies and damages

available to each such person individually for the 42 U.S.C. § 1983 violations. Plaintiffs seek such

damages as a result of the wrongful death of their mother. The County's policies, practices, and

customs caused, were proximate or producing causes of, and were moving forces behind and

caused the following damages suffered by these people, for which they individually seek

compensation:

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by them resulting from and
  caused by the decedent's death;

- future mental anguish and emotional distress suffered by them resulting from and
  caused by the decedent's death; and

- loss of companionship or society, as applicable, that they would have received from
  the decedent.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C.

§§ 1983 and 1988.

IV.     Concluding Allegations and Prayer

        A.     Conditions Precedent

        111.    All conditions precedent to assertion of all claims herein have occurred.

        B.     Use of Documents at Trial or Pretrial Proceedings

        112.    Plaintiffs and Claimant Heirs intend to use at one or more pretrial proceedings or at trial all documents produced by Defendant in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act requests.

        C.     Jury Demand

        113.    Plaintiffs and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

        D.     Prayer

        114.    For these reasons, Plaintiffs ask that Defendant be cited to appear and answer, and that Plaintiff, any other wrongful death beneficiaries, and Claimant Heirs have judgment for

damages within the jurisdictional limits of the court and against Defendant for all damages referenced above and below in this pleading:

      a)    actual damages, including but not necessarily limited to:

- medical expenses for the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by Plaintiffs resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Plaintiffs resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish;

- the decedent's loss of life or loss of enjoyment of life or both; and

- Plaintiffs' loss of companionship or society or both as applicable;

      b)    reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

      c)    court costs and all other recoverable costs;

      d)    prejudgment and postjudgment interest at the highest allowable rates; and

      e)    all other relief, legal and equitable, general and special, to which Plaintiffs, any other wrongful death beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


/s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:    (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@deanmalone.com
Angelika Anderson
Texas State Bar No. 24136709
angelika.anderson@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:      (214) 670-9904

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court, which provided notice to the following attorneys who have appeared in this matter:

Melvin Keith Ogle
Tarrant County Criminal District Attorney's Office
Civil Division

Attorney for Defendant Tarrant County, Texas

/s/ T. Dean Malone
T. Dean Malone